# GENERAL SESSIONS.

## NEW YORK, NOVEMBER, ·1823.

*The People*　⎫
　　vs.　　⎬ MANSLAUGHTER.
*Thomas Ward.*　⎭

*Maxwell*, District Attorney, for the prosecution.
*John L. Graham, John A. Graham, Wm. M. Price,*
and *John Anthon, Esqrs.* Counsel for the Prisoner.

The jury were called, and the following oath administered
to them : " You do swear that you will true answers give
" touching your competency as an impartial juror between
" the people of the state of New-York, and Thomas Ward,
" the prisoner at the bar."

After they were sworn, the following questions were
propounded to them :　" Have you heard any thing of
this case ?"　" Do you feel any prejudice for or against·the
prisoner at the bar ?"

Upon their answering in the negative to the last ques-
tion they took their seats.

The prisoner was charged in an indictment for man- slaughter, with having wilfully and feloniously killed Albert Robinson, by a blow inflicted on the 17th of Octo- ber last, on his temple, by the rung of a cart.

The prisoner was a young man of good appearance and respectable deportment, apparently about 26 years of age, and by occupation a cartman. The testimony in relation to the facts was remarkably clear and consis- tent. The witnesses were evidently persons of intelligence and veracity, and the principal question for the jury to try rested upon the character and legal description of the of- fence.

Mr. Maxwell opened the case on the part of the people, and made an exposition of the facts he expected to prove, and of the law as applicable to them. He cited 3 Chitty's C. L. 730. *in notis.* The testimony in support of the prosecution was then introduced.

Dr. Marinus Willet, junr. surgeon of the New York Hospital, to which the deceased had been taken, testified that he examined the head of Robinson, and found little evidence of serious injury on the external part of it. There were symptoms, however, of a compression of the brain, and there was a bruise over the right eyelid, ex- tending from above the temple, 2 1-2 or 3 inches down upon the cheek, which appeared to be such a one as might have been produced by a blow. The patient was brought in on the evening of Saturday, and on Sunday evening the operation of trepanning was performed by Dr. Mott. The scull was found to be fractured, but not so badly but the patient, had no other injury existed,

might have recovered by the application of ordinary reme-
dies. The death of Robinson, which took place about 3
o'clock on Monday morning, was occasioned, as witness
believes, not by the fracture, but by the rupture of a blood-
vessel, the artery of the dura mater, and the extravasation
of blood on the brain. Believes the blow to have occa-
sioned the death.

Peter Bogert, a cartman, testified, that he was return-
ing home on the evening of the affray ; it was between
six and seven o'clock, not very dark, but the lamps were
lighted. Three carts were passing down Chamber street;
the first Ward's, the second Fash's, and the third that of
the witness. Observed Robinson, the deceased, passing
down the flagging, which is laid, transversely, from the
corner of Chamber and Chapel to the east side of Hud-
son street. He had a tin kettle in his hand, and was
going the same way with Ward. Being within about
two feet of Ward's cart, (who was upon a walk,) he
turned round, and seized his horse by the head with his
left hand. The horse sprung from him, and turned
upon the side walk, with so much power and violence as
to have nearly thrown Ward from his cart. Ward was
very near the side walk at the time, and as he was turn-
ing into Chapel street, and deceased into Hudson street,
where those streets form an acute angle, the further they
advanced, the less they were incommoded by each other.
When Robinson thus took hold of the horse's bridle,
Ward laid hold of his monachie, and threw it at him.
[Monachie is said to be a Dutch word, and was explain-
ed to mean a fore rung of the cart, to which the lines
were occasionally made fast, about three feet long, three
inches by two and a half in thickness, at the bottom,

and lessening almost to a point at the top, usually made 'of oak or hickory.] The monachie thus thrown by Ward did not hit deceased; but the latter picked it up, drew it across his shoulders with both hands, in a threatening attitude towards Ward, as if with intention to strike him. Ward's cart, however, had at this time so far advanced that he was not within striking distance, being about three feet from the tail of the cart. There= upon, and. almost simultaneously, Ward stopped his horse, stepped to the tail of his cart, sprang from it towards Robinson, and, in a momentary scuffle, wrested the monachie from his hand, shoved him back a foot or two, and with both hands hold of the instrument, knocked him down with it by a blow on the right side of the head. At the moment of striking, Ward said to deceased, " You damn'd son of a bitch, a little more and you would have thrown me from my cart !" But the word and the blow seemed together, and witness never knew an affray more rapid from its commencement to its conclusion. It seemed to be the transaction of a moment. Robinson fell, and Ward jumped upon his cart, taking the mon= achie with him, passed on about 25 feet, then stopped, hooked his wheel, and came back ; but seeing Mr. Ryder with the man up, he again mounted his cart, and rode off altogether.

On his cross-examination, witness testified that he knew neither Ward nor Robinson previous to the trans- action. Ward had a leather trunk and a roll of carpet- ing on his cart at the time. Deceased had no offensive weapon, but was in no danger from Ward's horse, which, when seized, was quite restive. When Ryder took up deceased, he called him by name, and also spoke to

N'W YORK, prisoner, and said, "Ward! for shame! you ought not to
Nov. 1823. strike a man so." Could not say whether Robinson was
The People intoxicated or not, nor for what reason he seized the
v. horse. Was knocked down by the side of witness' cart;
Ward. done very quick; and the whole almost one act. Robinson
picked up the monachie by the wheel—was a stouter man
than Ward.

Daniel Fash, a cartman, who followed Ward at the
time of the affray, confirmed, in all its essential particu-
lars, the statement made by Bogert. He saw the mon-
achie thrown at Robinson by Ward. It flew over his
head, at the distance of about two feet above it. On his
cross-examination, he stated that he remained at the
place until Mr. Ryder had raised up deceased. The
hat of the latter was not struck off by the blow. As
witness was going down Hudson street, and Ward down
Chapel, it brought Robinson between their carts, but the
further off as they progressed, as the streets diverged in
different directions.

Richard G. Ryder, who was also a cartman, came
up just at the time Robinson held the monachie
in his hand in an attitude of hostility to Ward. Saw
Ward strike with the stick. It was but one blow.
The man fell, and witness jumped off to his relief. Found
it was Robinson, whom he knew; and, seeing that the
person who struck him was the prisoner, whom he also
knew, he cried "shame" to Ward. Robinson laid life-
less as a log, and totally insensible. Ward removed off
a few feet, where he remained. Witness raised up de-
ceased, and asked him if he knew him. Deceased nod-
ded assent; witness helped him across the street, washed

the blood from his face, and, at the instance of a young gentleman who came up, bathed his wounds also with spirits. Deceased then jumped upon his feet, refused to be carried home by witness on his cart, jerked away, and said he could go home alone. Acted as if he was intoxicated, for he went down Chamber street, which was not his way home. Had known deceased twelve or fourteen years. Heard Ward only say, in reply to a suggestion of witness that a cartman had struck deceased with the rung of his cart, that "it was not with his rung, but with his monachie." Ward gave no indications of regret. Had known him about eighteen months, and considered him a mild and worthy young man. Robinson formerly drove a cart. Did not speak until his head had been washed by the spirits.

N'W YORK, Nov. 1823.

The People v. Ward.

Dr. Willet was called again, and stated some further particulars relative to the trepanning. A piece of fractured bone was removed. The rupture of the blood vessel could not have been occasioned by the trepanning, for the blood on the brain was not only extravasated, but coagulated.

The defence of the prisoner was opened by John L. Graham, Esq., in a neat and appropriate speech, in which he commented with force and eloquence on the law and the testimony as applied to the case.

In behalf of the prisoner it was proved, by Robert Castles, that the deceased appeared to be intoxicated in the afternoon of the affray, and by Peter Nodine, and Joseph Archer, that he was a bad tempered man, passionate, perverse, and occasionally intemperate.

Ralph Olmstead, Robert Hyslop, Rufus L. Lord, Henry Hepburn, Charles Squire, Calvin W. Howe, and Allen C. Lee, all respectable merchants in the city, testified in substance that they had been acquainted with the prisoner for three or four years past; that he had uniformly manifested a mild and amiable disposition, rather timid than quarrelsome, and more disposed to yield than rigorously to assert his rights. That he was uniformly temperate, courteous and obliging, industrious and honest, and supported by his labor a mother and two or three sisters.

Dr. Jeremiah D. Fowler, of Mount Pleasant, the birthplace of the prisoner, testified that he had known him about 17 years, and from a boy. His disposition had always appeared to be mild and good; and his connections in Westchester were respectable.

Robert K. Foster had known the prisoner from 1810 to 1816, during which time he was an apprentice to witness, and appeared to possess the best disposition of any apprentice witness ever had. Witness was a shoemaker. Prisoner served out the full time of his engagement without indentures.

Dr. Richard L. Walker considered trepanning a dangerous operation. Patients often die from the inflammation occasioned by it, who might have recovered from the injury it was intended to remedy. The coagulated blood referred to by Dr. Willet, might have been occasioned by exposure to the air, nor would its coagulation prevent it from being absorbed. Witness could not decide with certainty, even had he performed the

operation himself; whether the death was occasioned by the monachie or by the trepanning. Did not see.the patient. Had known a rupture of a blood vessel from extreme passion. Persons of violent temper were liable to apoplexy from a surcharge of blood to the head.

N'W YORK,
Nov. 1823.

The People
v.
Ward.

Dr. Valentine Mott, who performed the operation of trepanning the deceased in the hospital, testified that his head was broken, and his death occasioned by the injury, and not by the trepanning. Of this he spoke positively, and with certainty.

The testimony here closed; and the cause was ably summed up by Mr. Anthon and Mr. Price, with the following eloquent speech by Doctor Graham, in defence of the prisoner :

*Gentlemen of the Jury :*

The Almighty, of his infinite goodness, has given to one man *ten* talents, to another *five* talents, and to a third *one* talent.—If I were to bury *my talent* in the earth, or lock it up on this occasion, I should not only do great injustice to the prisoner at the bar, but should also consider myself as sinning against the bounty of Providence. Therefore, as one of the counsel for the prisoner, I shall now have the honour of addressing you in his behalf.

The prisoner is indicted for the crime of *manslaughter*, in causing the death of Albert Robinson, by giving him a blow on the right side of the head with a stick attached to his cart, commonly called a monachie, on the evening

N'W YORK,
Nov. 1823.

The People
v.
Ward.

of the 17th of October now last; to which charge the prisoner has pleaded *not-guilty*, and put himself upon God and you, gentlemen of the jury, for trial.

I congratulate the prisoner and the public, that the constitution and laws have wisely placed in your hands the trial of this cause; knowing, as I do, the character of our New York jurors being proverbial for wisdom and sound discretion—lovers of liberty, humanity, and justice, and generally speaking, men possessing undeviating integrity, and of high and delicate honour.

Having, with great deliberation, examined and considered the law and facts—the principles which ought to govern in this case, and the tribunal which is to *decide the fate of the prisoner*, I have made up my opinion, and fear not the final result. Of the law, as well as of the facts, you are the judges, and I shall draw on you, for my client, your verdict of acquittal. As discreet men, and jurors, you will always pay the greatest deference and respect to what may fall from the lips of a learned judge, especially when it comes from one whose life has been devoted to philosophical and juridical studies; but remember, that the greatest lawyers and the greatest judges often differ in opinion, as much as in their looks, on the subject of *homicide*, which by the books is divided into three kinds: *justifiable, excusable*, and *felonious*. I contend, that instead of the prisoner having been guilty of *manslaughter*, as charged in the indictment, the act is *excusable homicide, se defendendo*, or in self defence.

To establish fully my defence for the prisoner, I shall

confine myself principally to the law and the facts, since eloquence is necessary only to defend a bad cause, and a good one may easily be supported by the logic of com- mon sense, and the rhetoric of unstudied expression. Gentlemen, *time, place,* and *provocation,* are all important in the investigation; thereon hangs the very *gist* of this indictment; and this case, like all others, must stand or fall on its own merits. The learned counsel associated with me have read to you the law from *Black. Com., Hale's Pleas of the Crown, East's Crown Law, Lovet's case, Harcourt's case, Goodwin's case,* and some other authorities which ought to govern in this case. I subscribe fully to the doctrine, by those gentleman so ably, forcibly, and eloquently contended for, whatever may be the opinion of the court to the contrary.

Let me call your attention to the *two* great laws of human society, from whence *all the rest* derive their course, force, and obligation; they are those of EQUITY and SELF-PRESERVATION; by the first, all men are bound alike not to hurt one another; by the second, all men have a right to defend themselves. The civil law says, "It is a maxim of the law, *that whatever we do in the way, and for the ends of self defence, we may lawfully do.*" This principle of the civil law has been fully recognized in the 5th section of the act, passed the 14th of February, 1787, by our legislature, declaring, that persons *killing in self defence,* or by *misfortune,* shall be thereof fully acquitted and discharged. 1 L. N. Y. p. 67.

All the laws of society are entirely reciprocal, and no man ought to be exempt from their force; and whoever violates this primary law of nature, ought by the law of

nature to be destroyed. He who observes no law forfeits all title to the protection of law. It is wickedness not to destroy a destroyer, and all the ill consequences of *self defence* are chargeable upon him *only* who occasioned them. To allow a license to any man to do evil, with impunity, is to make vice triumph over virtue, and innocence the prey to the guilty. The law of nature does not only allow us, but obliges us to defend ourselves. It is our duty, not only to ourselves, but to society. If we suffer tamely a lawless attack upon our person, property, and fortunes, we encourage it, and involve others in our doom. And Cicero says, "He who does not resist *mischief* when he may, is guilty of the same crime, as if he had deserted his *parents*, his friends, and his country." So that the conduct of my client, in *defending his person* and *his property* against the unlawfully and wicked attack of the deceased, is, I contend, *excusable homicide in self defence*, by all laws human and divine.

Again; the motive from which an action springs ought never to be overlooked, and it would be against natural justice to condemn a man to punishment for what is owing rather to his *misfortune* than his *fault*. The prisoner could have had no motive but merely to defend himself and his property. The deceased, *a total stranger to him*, seized his horse by the head, and stopped him on the public high road, when my client was in the peace of God, in the peace of the people of the state of New York, and about his lawful business. This is a very important fact, and calls for the most serious consideration; and it ought to be most carefully weighed by every juror on the panel. Suppose either of you, gentlemen, had been

stopped on the high road, just at the dusk of the evening, by a stranger, as was the prisoner by the deceased—your property seized *by force*—your person most grievously insulted and injured, and you had no alternative but to submit to the insult and outrage, or by defending yourself and property against the mischief intended you; your own good sense, and knowledge of *cause* and *effect*, will instantly give the answer.

The counsel who preceded me in summing up this cause, having gone minutely into the testimony, I shall not trespass on your time by recapitulating the evidence, as the same must be fresh in your minds. I would ask, then, can you consign to a state's prison, for years, a worthy citizen, who, unfortunately, to save himself and his property from destruction, was driven of necessity to give the blow which has since proved the death of a man whom the prisoner believed, at the time, was a lawless desperado? The prisoner deeply laments the death of the deceased; but he feels no remorse—no disquieting dread of God or man, because his conscience whispers to him, that what he did on that occasion was only in *self defence.*

The honourable the district attorney, in withholding from the jury the examination of the prisoner taken in the police immediately on his arrest, I must say, notwithstanding my friendship and esteem for that gentleman, does not comport with my ideas of justice and humanity; and to my mind, it is self-evident Mr. Maxwell intends to press all sail that he possibly can to convict the prisoner. I therefore most earnestly request of you to banish from your ears the charms of his eloquence, and with your

oaths upon your consciences, make to this tribunal and your God, your solemn verdict. Gentlemen, in the name of your own interest—your own honour—and your own glory, I call upon you, by your verdict, to pronounce judgment on *yourselves*, because a similar misfortune may some day, by the providence of God, happen to some of you. If the authorities and arguments my learned associates and I have used, have not been convincing, you would not be convinced though one should arise from the dead. Justice and humanity revolt at the idea of a verdict of guilty, against the prisoner; and should you, by your verdict, pronounce the horrible word *guilty*, I should blush over this departure from those characteristic features of moral rectitude in the gentlemen who fill the panel, and tremble at the impending vengeance which awaits your future destiny.

The argument was concluded in behalf of the people, by Mr. Maxwell, the district Attorney, in his usual clear, candid, and imp. ssive manner. An appropriate charge was delivered by the Recorder, in which the prominent facts were recapitulated, and the law relative to manslaughter, and the distinction between it and chance medley in self defence, was stated and explained with great precision and perspicuity. At 9 o'clock it was committed to the jury, who in about two hours returned with a verdict of Not Guity.